IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ANGEL M. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ANGEL M. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KATIE JO M., APPELLANT.

Filed November 23, 2021.    Nos. A-21-261 through A-21-263.

Appeals from the County Court for Buffalo County: JOHN P. RADEMACHER, Judge.
Affirmed.

Nathan P. Husak, of Bruner, Frank, Schumacher & Husak, L.L.C., for appellant.

Mandi J. Amy, Deputy Buffalo County Attorney, for appellee.

Elizabeth J. Klingelhoefer, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O.,
guardian ad litem.

MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Katie M. appeals from an order of the Buffalo County Court sitting as a juvenile court,
terminating her parental rights to three of her children. Upon our de novo review of the record, we
affirm the juvenile court's order.

## II. STATEMENT OF FACTS

### 1. PROCEDURAL BACKGROUND

Katie is the biological mother of Angel M., born in August 2013; Arya M., born in March 2015; and Annabell M., born in November 2016. The children share the same biological father. As discussed further below, his parental rights to Angel, Arya, and Annabell were terminated in November 2019, and we only discuss him as necessary to the resolution of the current appeal by Katie.

The children were removed from the home by law enforcement on February 6, 2018, following a report of domestic violence. Separate petitions were filed later that day to adjudicate Angel, Arya, and Annabell pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on Katie and the father becoming involved in physical domestic violence while the children were in the home, placing them at risk of harm. The children were adjudicated in March 2018. They have remained out of the home since they were removed.

The juvenile court entered a dispositional plan on April 30, 2018, adopting the case plan presented by the Nebraska Department of Health and Human Services (the Department). Katie's case plan goals included meeting her children's medical and therapeutic needs; providing a safe, suitable, and stable living environment; and demonstrating consistent and appropriate parenting of her children. Several review hearings were held during the case--occurring on July 30 and October 25, 2018; January 28, April 24, and August 14, 2019; and January 30, May 7, August 17, and November 12, 2020. The goals of the court adopted plans have been consistent throughout the case.

### (a) First Motion for Termination

On August 8, 2019, the guardian ad litem (GAL) filed a motion for termination of Katie and the father's rights in regard to the three children; alleging statutory grounds to terminate the father's rights existed pursuant to Neb. Rev. Stat. § 43-292(2), (4) (6), and (7) (Reissue 2016), and Katie's rights under § 43-292(2), (6), and (7). A termination trial was held over 3 days in October.

In an order entered on November 27, 2019, the juvenile court terminated the father's parental rights finding the State and GAL had proved by clear and convincing evidence that grounds existed under § 43-292(2), (6), and (7) and that termination of his parental rights was in the children's best interests. The court also found that the State and GAL had proved by clear and convincing evidence that grounds existed under § 43-292(2) and (7) to terminate Katie's parental rights.

However, the court found that there was not clear and convincing evidence that the termination of Katie's rights was in the best interest of her children. The court also found that the State and GAL had failed to rebut the presumption that Katie was a fit parent. The court noted that Katie had completed a parenting class, was attending individual therapy, maintained a residence, had addressed isolated safety concerns promptly, was employed, had food in the home, and had a vehicle. While concerns regarding Katie's finances had been raised at trial, the court observed that Katie had a $638 per month child support obligation. The court relied on documentary evidence to observe that Katie took this obligation seriously to the point that she was threatened with eviction and had her electricity turned off, but was current with her child support payments. While

the court noted that Katie had work to do before she would be able to achieve reunification with her children, the court found that Katie had made significant progress in her case. The court found that because Katie was complying with her case plan, Katie should be awarded more time to improve as a parent.

### (b) Modification of Child Support Obligation

In an order entered on January 31, 2020, the juvenile court authorized Katie's counsel to pursue a modification of her child support with the Buffalo County District Court. The juvenile court found that the strict application of the child support guidelines appeared contrary to the children's best interests and was a barrier to the reunification of the children with Katie. On March 13, the district court ordered that Katie's child support be reduced from $638 per month to $300 per month, retroactive to March 1.

### (c) Second Motion for Termination

On October 27, 2020, the State filed a second motion for termination of Katie's parental rights in regard to the three children, alleging statutory grounds to terminate existed pursuant to § 43-292(2), (6), and (7), and alleging that termination was in the best interests of the children.

## 2. TRIAL

The second termination trial was held over the course of 2 days in January 2021. At the trial, 14 witnesses testified and nearly 30 exhibits were received by the juvenile court.

### (a) Children's Therapeutic and Developmental Needs

Jody Angel-Trejo, a licensed independent mental health practitioner and Arya's therapist, testified that she conducted initial assessments of Angel and Arya in the summer of 2019 when the children first began individual therapy. Angel-Trejo described Angel's and Arya's severe social and emotional delays. Both children were diagnosed with specified trauma and stressor-related disorder, as they displayed some lingering symptoms of post-traumatic stress disorder. Angel is cognitively delayed and has global delays, impacting her communication and gross motor skills. Angel-Trejo testified that Angel and Arya's delays were indicative of early neglect due to lack of engagement by their caretakers, as well as stress caused by domestic violence in the household.

Angel-Trejo went on to testify that because Arya had been subjected to developmental trauma she has significant attachment issues. As a result, Arya needs constant interaction to feel safe. Angel-Trejo noted that Arya has responded positively to her removal and therapeutic interventions, making social and emotional improvements. Angel-Trejo testified that while Arya is still developmentally behind her peers, Arya's placement with a caregiver who is attuned to Arya's needs has narrowed the gap between Arya and her peers.

Angel-Trejo also serves as the supervisor of Angel's therapist, Briana Woodside, and testified that since removal, Angel had improved in all areas of functioning. However, Angel still receives speech, occupational, and individual therapy and will likely need those services for the foreseeable future.

Angel-Trejo saw Katie throughout 2020 for a combination of family and parent sessions. The purpose of these sessions was initially to observe and coach Katie in interactions with her children. In August 2020, the focus of the sessions shifted to supporting Katie and to providing

education on her children's developmental and therapeutic needs. Angel-Trejo testified that despite Katie's clear desire to parent her children well, she saw a gap in Katie's ability to understand her children's needs based on reports Angel-Trejo was provided with during team meetings. Angel-Trejo noted that Katie's lack of understanding regarding her children's developmental limitations created safety issues as Katie allowed the children to be independent beyond their level of functioning. Angel-Trejo observed that while Katie had improved her attachment with the children, the attachment was still an insecure one. Angel-Trejo defined an insecure attachment as the child meeting the parent with ambivalence and nonresponsiveness when the parent is acting as an authority figure.

Angel-Trejo testified it will be necessary for caregivers and professionals to mitigate the children's trauma into their teen years and possibly beyond. Therefore, Katie's inability to take charge or act as an authority figure to meet her children's needs was a concern to Angel-Trejo. Angel-Trejo was likewise concerned that Katie still needed coaching and prompting to appropriately regulate her children, despite Angel-Trejo working with Katie for nearly 1 year. Angel-Trejo also emphasized that because Angel and Arya had experienced childhood trauma, they were at risk for depression, anxiety, and relationship issues into adulthood and needed a caregiver who could respond to that trauma appropriately.

Woodside, a licensed clinical social worker, began working with Angel in August 2020. Woodside provided coaching to Katie during Angel's family sessions and attending parent sessions with Angel-Trejo and Katie. Woodside emphasized precoaching, predictability, and repetitiveness for Angel, along with examples of how Katie might implement these strategies. However, Woodside observed that Katie struggled to apply the strategies provided by Woodside and Angel-Trejo to new situations with her children, making it difficult to coach Katie on prospective issues.

Woodside shared Angel-Trejo's concerns about Katie's inability to identify safety concerns or the appropriate level of independence for her children given their current development. Woodside testified that consistent boundaries were necessary not only to keep the children safe, but also to develop a secure attachment. Woodside noted that Angel struggles with an inability to recognize what is safe and that her judgment is delayed. Therefore, Angel needs a caregiver to provide safety and help Angel with "those judgment calls" that Angel is not able to make due to her delayed development. Woodside was concerned that Katie did not see the degree to which Angel was delayed and, as a result, Katie may not be able to meet Angel's ongoing needs. Woodside testified that Angel may never catch up to the functioning levels of her peers.

Visitation workers were present when Katie would pick up and drop off Angel at speech therapy. Workers testified to Katie failing to ask Angel's speech therapists what Angel was working on in therapy or whether there were home exercises Katie could do with Angel to assist the therapy. Workers observed a lack of response from Katie when Angel's speech therapists were communicating to her about a session. If information was provided by Angel's therapist, it was because the therapist had initiated the information exchange rather than Katie. Workers likewise noted that Katie would not ask Angel how her speech therapy had gone or inquire about what Angel was working on with her therapists.

Katie testified in her own behalf. Her testimony reflected her belief that she is able to meet the needs of her children, and she denied having any issues communicating with Angel's therapists.

### (b) Missed Medical Appointments

Alexandra Snover was the only Department caseworker assigned to Katie's case since the first termination trial in 2019. Snover testified to occasions when Katie had forgotten about the children's medical appointments and did not attend them. Snover expressed that a substantial number of the children's medical appointments would only occur if the Department or the foster parents intervened to ensure the children's appointments were kept. Snover noted that while Katie makes an effort, she is unable to manage her time and keep track of scheduled appointments. Snover testified that Katie's inability to create structure impacts the children's medical needs.

The children's foster mother also testified to needing to intervene to ensure the children attended necessary medical appointments. It was Katie's responsibility to make such appointments and Katie received prompting to do so during team meetings. The foster mother recounted Katie failing to take the children to several appointments due to her own oversight; including necessary physicals and checkups for school attendance, ear appointments for checkups following ear surgeries, vision appointments, and dental appointments. On one occasion Katie took the children out of school to attend an appointment, only to later realize the appointment was scheduled for the following month. The foster mother began taking the children to their scheduled appointments as a precaution in case Katie would not attend. The court-appointed special advocate (CASA) volunteer, who had been assigned to the case since its start in 2018, testified that Arya "had to miss some school" because Katie had failed to schedule Arya's kindergarten physical.

In her testimony, Katie agreed that she had forgotten to schedule some of the children's appointments, but she testified that she had only a 10-minute break from work to schedule appointments during business hours. Katie acknowledged it was important that she be able to set up the children's medical appointments on her own and testified that she has started scheduling appointments earlier.

### (c) Failure to Schedule Daycare

At times, Katie also forgot to set up daycare for the children during school breaks. Bonnie Deaver, a visitation worker who supervised visits from October 2020 to January 2021, testified that on three separate occasions Katie failed to set up daycare for the children because she did not know when the children had school breaks, despite that task being her responsibility. During these occasions Katie did not know where her children were. On one of these occasions, Katie and Deaver arrived at the children's school and were met by a school official who informed them that the school had altered its vacation schedule and that parents were notified about the change via email a week prior. Deaver testified that Katie confirmed she was receiving notification emails from the school. Deaver further stated that the children were later located at daycare on two of the dates and at their foster home the other date, as Katie had failed to schedule daycare and the daycare did not have availability for the children.

In her testimony, Katie again acknowledged that she had occasionally forgotten to schedule daycare for the children and testified that she has gone through the school's website to ensure that she schedules daycare on days the children are on break.

### (d) Supervised Visitation

Snover testified that throughout her time as the family's caseworker, Katie's visitations remained fully supervised. Snover cited Katie allowing the children to write a letter to their father, though his rights had been terminated and he had a pending child abuse charge, as a reason why visits remained supervised. Katie did not speak to the children's therapists prior to advising the children to write to their father, despite a history of sexual abuse between the father and the children.

Katie testified that she knew that it was not appropriate for the children to see their father, but she thought that allowing them to write a letter to him may be therapeutic. Katie stated that she had no intention of giving the letter to the children's father.

Additionally, visits were moved outside of Katie's home to a visitation center in September 2020 due to a flea infestation. Visits were moved outside of Katie's home again in November due to the strong odor of animal feces and urine in the house. Snover testified that though the smell was not as strong, the odor remained in the home even after cleaning by Katie.

The foster mother testified to the children coming home dirty after visits with Katie. The foster mother described the children itching and scratching themselves because they were not bathed properly while in Katie's care. The foster mother also observed flea bites on Angel's neck at the time of the infestation in Katie's home.

A visitation worker testified that Katie had been aware of the fleas in her home for weeks before she alerted anyone about the infestation. After the worker discussed treatment options with Katie, she did address the infestation and, as noted above, visits were moved to a visitation center while the apartment was treated and cleaned. When the flea infestation was discussed at a team meeting, Snover testified that Katie minimized the event and did not understand why it was a safety concern.

### (e) Parenting Concerns

Multiple visitation workers who supervised visits between Katie and the children and provided family support to Katie, testified that they had concerns about Katie's ability to parent the children. Deaver testified that although Katie initially appeared to be willing and receptive to family support services, there was an underlying defiance and reluctance in the actual implementation of the parenting skills taught. Katie completed three different parenting courses during her case. Multiple visitation workers testified that Katie understood the various curricula discussed, but usually chose not to apply the techniques, and on the occasions Katie would implement the parenting techniques, she would do so sporadically and eventually stop. Katie would also ignore parenting suggestions and coaching when provided by workers. Workers did not see improvement in Katie's parenting of the children throughout the case. Deaver observed Katie utilizing learned parenting techniques, at most, 5 percent of the time.

Many visitation workers testified that Katie was unable to act as an authority figure with the children, and instead acted more as a friend. Deaver testified that Katie's inability to impose

boundaries led to visits where the children were in control 90 percent of the time. Deaver reported that instead of using the parenting techniques she had been taught, Katie bargained, negotiated, shouted, gave repetitive directions, or ignored and dismissed the behaviors of the children. Another worker was concerned that when Katie was scolding the children, she would not explain to the children why their behavior was wrong. Workers and the CASA volunteer testified that the children were not responsive to Katie's directives but were responsive to other adults if one stepped in to set a boundary. Visitations were described as "chaotic," "traumatic," and "erratic."

Workers also noted that Katie showed favoritism toward Arya by ignoring the other children's requests and instead meeting Arya's demands. The favoritism resulted in emotional outbursts from the other children and often left Angel to play by herself. If Angel would tell Katie she was sad, workers testified that Katie would direct her attention to Arya and Annabell, or redirect Angel to eat or pick up toys.

Mealtime was also a challenge for the family. Deaver testified that Katie struggled to get the children to eat, as the children refused to listen to Katie at mealtimes. The CASA volunteer further noted that while she had observed the children acting out and refusing to eat at mealtime with Katie, she did not see the same behavioral issues from the children at their foster home. Geiger, a visitation worker from March to September 2020, testified that Katie struggled to set expectations and manage the children's behavior while cooking dinner and that there was not a routine to mealtimes. Geiger further testified that throughout her time on the case, Katie had trouble getting the children to eat the meals she prepared. Additionally, Katie was only able to identify the children's behavior at mealtime as a barrier to the success of the visit after prompting by Geiger. When Geiger then asked Katie to identify why mealtime was challenging for the family, Katie was unable to identify solutions without Geiger's assistance.

Krystal Wright worked as Katie's family support worker from March to November 2020. Wright testified that she and Katie would work together weekly on parenting techniques, budgeting, housing, and transportation. Wright testified that Katie was willing to learn and utilize the skills she learned in parenting classes. Wright had no concerns regarding Katie's ability to parent her children. However, Wright acknowledged that she had only seen Katie interact with the children on one occasion.

(f) Safety Concerns

Workers provided several examples of Katie's inability to control her children which created safety concerns. Deaver testified that in October 2020, she had to step out in front of Annabell to stop her from running in front of a car. Also in October and in November, one of the children was allowed by Katie to run toward a busy street. On each occasion, Deaver had to step in and give directives to the children to stop the behavior. Deaver testified that Katie either did not notice that a potentially unsafe situation was occurring or she was unable to act quickly enough to take charge and stop the children.

Holliday Quezada was a visitation worker who worked on Katie's case twice; once prior to the first motion to terminate, from March 2018 to July 2019, and more recently from July to October 2020. Quezada testified that he had concerns regarding Katie's ability to parent, specifically finding that the same areas she was struggling with when he worked with her in early 2019 were still present at the end of 2020. Quezada had concerns regarding Katie's lack of

supervision of Annabell; citing Annabell touching the stove after it had recently been used, Katie placing Annabell in the driver's seat of Katie's vehicle while the car was running, and a separate time Annabell had locked Katie out of the vehicle while Annabell was playing inside. When Quezada brought a safety concern to Katie's attention, Katie was unable to recognize the concern herself or would deny the concerning behavior had occurred.

Snover stated that throughout the case Katie was unable to determine when safety concerns were present and how to respond to them appropriately.

### (g) Finances and Eviction

Snover testified that Katie had progressed in the areas of transportation, housing, and finances; noting that she had no concern with Katie's budgeting. However, Snover expressed concerns that Katie had spent a $10,000 inheritance within 2 months of receipt. Additionally, Katie was evicted in December 2019 and did not acquire a new apartment until May 2020. Snover also expressed concerns that Katie needed a number of months to find suitable housing after she had been evicted.

Christina Dean, a visitation worker who worked with Katie from September 2019 to April 2020, worked extensively with Katie to acquire new housing after Katie was evicted in December 2019. Dean assisted Katie in looking at low-income housing, completing an application with the Kearney Housing Agency, and contacting private landlords. Dean observed that Katie was discouraged throughout the process as she had a low credit score and a history of evictions which prevented her from working with the Kearney Housing Agency. Snover testified that Katie likewise reported that her previous eviction record and a leftover rental balance prevented her from acquiring new housing immediately.

Katie testified that the only time she was without employment during her case was when she was furloughed for 2 months at the beginning of the COVID-19 pandemic. During her furlough Katie used her inheritance to pay for incoming bills. Katie also used the inheritance money to pay for a past eviction debt, a van to transport her children, a washer and dryer, and a three-bunk bed for the children.

During the trial, the juvenile court noted that after Katie's child support obligation was reduced in March 2020, she was soon after able to find and maintain housing. The court observed that the child support obligation largely contributed to Katie's eviction. As such, the court viewed Katie's lack of housing during early 2020 to be evidence of paying her large child support obligation rather than evidence of Katie's financial mismanagement.

### (h) Katie's Therapeutic Needs

Cristianne EagleFeather Moreno, a licensed mental health practitioner, worked with Katie in individual therapy beginning in November 2020, although Katie had been receiving individual therapy at the same office with other therapists since October 2018. By the time Katie had been transferred to her, Katie had seen four different therapists due to her previous therapists leaving the practice. Since starting with EagleFeather Moreno, Katie had been consistent in her attendance and had missed only two appointments; one because EagleFeather Moreno was out of the office and another because a team meeting had run long.

EagleFeather Moreno testified that she was working with Katie on managing stressors and did not feel starting trauma work with Katie would have been beneficial to the case. EagleFeather Moreno noted that it was not necessary for Katie to address her own trauma in order to effectively be a parent to her children. EagleFeather Moreno asserted that Katie knew how to utilize appropriate coping skills, but EagleFeather Moreno did worry that Katie may become overwhelmed and forget to implement the skills.

### (i) Katie's Bond With Her Children

Katie's sister and mother testified to the love Katie has for her children. Additionally, throughout the trial, all therapists and visitation workers recognized the love Katie has for her children and her shared affection with them.

### 3. ORDER

Following the termination hearing, the juvenile court entered an order on February 28, 2021, terminating Katie's rights to Angel, Arya, and Annabell. The court found that the State had met its burden of proving substantial and continuous neglect, and that the children had been in out-of-home placement for 15 or more months out of the most recent 22 months pursuant to § 43-292(2) and (7). The court also found that pursuant to § 43-292(6), Katie also failed to correct the conditions that led to the children being adjudicated under § 43-247(3)(a). The court further found that Katie was an unfit parent and that it was in the best interests of the children to have Katie's parental rights terminated.

Katie appeals.

## III. ASSIGNMENTS OF ERROR

Katie assigns, restated, that the juvenile court erred in finding that there was sufficient evidence to show that she was an unfit parent and that termination of her parental rights was in the best interests of the children.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 42-292(2), (6), and (7). Katie does not challenge the juvenile court's finding that statutory grounds to terminate have been met. However, because our review is de novo, we address this requirement for termination of parental rights.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and,

unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra*.

Here, it is undisputed that the children have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from Katie's home on February 6, 2018. The State filed its motion for termination of parental rights on October 27, 2020, and the termination trial was held in January 2021. The children remained out of the home since their removal in February 2018. At the time of trial, the children had been out of the home for 35 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Katie's parental rights exists.

### 2. PARENTAL UNFITNESS AND BEST INTERESTS

Katie assigns that the juvenile court erred in finding that she was an unfit parent and that it was in the children's best interests to terminate her parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra*. There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquires. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al., supra*. In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al., supra*.

We do not find Katie's eviction or spending of her inheritance to evidence her parental unfitness. As the juvenile court noted, shortly after Katie's child support obligations were reduced by the district court, she was able to acquire and maintain housing. Additionally, Katie's

inheritance allowed her to pay off her rental debts and put money towards a new apartment. Katie also used her inheritance money to purchase a van to transport her children and household items. The only time Katie was without employment during her case was when she was furloughed in early 2020 due to the COVID-19 pandemic. Katie used her inheritance to pay her bills during her furlough to prevent acquiring additional debts. Katie's use of her inheritance money was appropriate, and we observe that her eviction was caused by honoring her large child support obligation and was remedied once her obligation was reduced and she came into her inheritance.

We also do not find that Katie failed to address her own trauma through individual therapy. Since Katie began receiving individual therapy she has seen four therapists within the same practice. While reports submitted into evidence note that at times there were breaks in Katie's therapy attendance, these breaks often followed the departure of her current therapist from the practice. Though Katie could have been more prompt in beginning therapy with her new practitioners, these lapses in attendance were also the result of transitions of care. Furthermore, Katie's current therapist testified that she believed working with Katie on coping skills and stress management rather than on Katie's own trauma work was more valuable to Katie and her case. Katie's therapist stated that it is not necessary for Katie to address her own trauma in order to effectively parent her children.

However, we do find that there is other clear and convincing evidence to show that Katie is unfit and that termination of her parental rights is in the best interests of the children.

Katie argues that she is a fit parent because she loves her children and shares a bond with them. Trial testimony evidenced the love Katie has for her children and her ability to delight in them. However, the Nebraska Supreme Court has held that having a bond with a child does not make the parent a fit person to provide parental care for the child. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Rather, the evidence adduced at the termination trial demonstrates that Katie is unable to provide her children with the level of parental care they require.

Angel and Arya have severe deficits in their development, which their therapeutic professionals have attributed to early neglect by their parents. Katie has struggled to understand her children's developmental needs despite receiving coaching and education during parent-only sessions with the children's therapists. Katie's inability to understand the children's true functioning and development levels inhibits the formation of a secure attachments and has led to safety issues.

The children's therapists attribute Katie's lack of parenting progress to her inability to understand her children's developmental needs. While the family had been in therapy for over a year at the time of trial, an ambivalent attachment remained between Katie and her children. The children are at risk for depression, anxiety, mental health issues, and substance use later in life and require a caregiver who is able to mitigate their trauma into adulthood. Due to trauma endured by the children, they need an attuned caregiver to feel safe. Throughout the case Katie has struggled to demonstrate that she understands and is able to meet her children's emotional needs.

Katie has also been unable to meet the children's medical needs throughout the case. Katie neglected to take the children to various appointments including routine and post-surgery checkups. Katie once took the children out of school to attend an appointment, only to later realize the appointment was scheduled for the following month. Katie failed to promptly schedule Arya's

kindergarten physical, resulting in Arya missing time from school. Katie has not engaged in Angel's speech therapy. Katie's failure to make and keep appointments is especially concerning as Angel requires ongoing speech and occupational therapy to meet her developmental needs. Angel also has a neurological condition which will require monitoring as she ages.

Throughout the case, there have been safety concerns. These safety concerns are caused both by the children's ambivalence towards Katie when she is acting as an authority figure and by Katie's inability to recognize safety concerns as such. Katie's failure to appropriately supervise the children has resulted in Annabell touching a stove after it had recently been in use, Annabell being placed in the front seat of a running car, and the children repeatedly running towards busy streets and alleyways. Conditions in Katie's apartment, including the odor of animal urine and feces and a flea infestation, also created safety issues. When presented with these safety issues by visitation workers or professionals at family meetings, Katie minimized the issues and did not understand the safety concerns.

Katie has completed three different parenting courses; however, visitation workers did not see Katie utilizing learned parenting techniques to address her children's misbehavior. Katie was either resistant to coaching or was unable to apply parenting techniques with any consistency. Katie was unable to identify deficits in her parenting or potential solutions without prompting from visitation workers. One visitation worker returned to the case after a year away from the family and did not see any improvement in Katie's ability to parent her children.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Katie's behavior over the course of the case, and based on Katie's need for professional coaching and prompting years into her case, she is unlikely to change in the future. The case plan goals have remained consistent throughout the case and have not been met, and there has been no improvement in Katie's ability to parent.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Angel, Arya, and Annabell have been in foster care since February 2018. They deserve stability in their lives and should not be suspended in foster care when Katie is unable to rehabilitate herself. Accordingly, we find there was clear and convincing evidence to show that Katie was unfit and that terminating her parental rights was in the children's best interests.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Katie's parental rights existed under § 43-292(7) and that termination of her parental rights is in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.